## IKE S. KNIGHT v. THE STATE.

### No. 4474. Decided February 5, 1909.

**1.—Same—Murder—Common Law Marriage.**

Where upon trial for murder the evidence showed that defendant and the mother-in-law of deceased had been living together as man and wife for six years, this would constitute a common law marriage.

**2.—Same—Change of Venue—Discretion of Court.**

Where upon trial for murder the record showed that a large majority of the witnesses swore on defendant's motion for change of venue that he could get a fair trial in the county where he was tried, and the matter was heard by the court, there was no error in overruling the motion as the bill of exceptions presented this matter.

**3.—Same—Evidence—Res Gestae—Res Inter Alios Acta.**

Where upon trial for murder the evidence showed that after defendant shot the deceased, he immediately proceeded down the street and shot the officer who attempted to take his gun from him, there was no error in permitting said officer to state what had occurred between him and defendant at that time and what defendant said, this was part of the res gestae and part of the original transaction.

**4.—Same—Evidence—Circumstances.**

Where upon trial for murder the evidence showed that the State's witness found a gun case after the killing, the fact that it was not thoroughly identi-

fied as belonging to the defendant in which he had carried the gun which he got at a pawn shop, did not render such testimony inadmissible.

**5.—Same—Evidence—Bill of Exceptions.**

Where upon trial for murder defendant offered to show a conversation or statement made by the woman with whom defendant lived in the relations of husband and wife, to show that she and her daughter and the deceased conspired against the defendant to get his property, and the bill of exceptions was defective in not stating what the witness would have sworn, the same could not be considered on appeal; besides this matter was immaterial under the facts of this case.

**6.—Same—Evidence—Confessions.**

Where upon trial for murder the written statement of defendant comported in all respects with the statute prescribed with reference to written confession of defendant's in jail, the same was admissible. However, in view of the fact that defendant swore that no warning was given and the hope of reward was held out to him by the officers, the court should have submitted the question as to whether said statement was voluntarily made.

**7.—Same—Evidence—Moral Turpitude.**

Upon trial for murder, testimony that defendant was indicted for felony or any crime involving moral turpitude within the last few years prior to the homicide was admissible, but the mere fact that the defendant cut a man does not necessarily involve moral turpitude and was therefore inadmissible.

**8.—Same—Evidence—Opinion of Witness.**

Where upon trial for murder the court correctly excluded the opinion of a witness as to why it was that defendant was being shot at by the officers, there was no error.

**9.—Same—Argument of Counsel.**

See opinion reminding State's counsel to stay within the record in the argument before the jury.

**10.—Same—Evidence—Extraneous Matters.**

Upon trial for murder testimony with reference to facts immediately following the homicide were admissible, in the absence of a showing in the bill of exceptions that they were not admissible.

**11.—Same—Charge of Court—Husband and Wife—Community Property.**

Where upon trial for murder the evidence showed that the difficulty arose out of the fact that the woman with whom defendant lived in common law marriage had sold the community property to deceased without defendant's consent, a requested charge defining the law of the right of the husband to control the community property as well as the separate property of the wife, should have been given.

**12.—Same—Charge of Court—Ejection.**

Where upon trial for murder there was no evidence that the deceased and his wife or either of them tried to take away defendant's household effects at the time of the homicide, but had taken possession of them under a bill of sale from defendant's wife, the court correctly refused a requested charge of defendant's right to use force in the event of ejection.

**13.—Same—Charge of Court—Husband and Wife—Credibility of Witnesses.**

Where upon trial for murder the evidence showed that defendant and the mother-in-law of the deceased lived together as husband and wife in common law marriage, it was reversible error to instruct the jury that if they believed that the parties did not so live together that they could use that fact to affect the defendant's credibility as a witness.

**14.—Same—Charge of Court—Defendants Right to Use Necessary Force.**

Where upon trial for murder the evidence showed that defendant and deceased's

mother-in-law lived together as husband and wife under common law marriage; that defendant's said wife had sold their household effects to the deceased, and that the latter together with his wife and mother-in-law obstructed defendant's passage through the house in which he and his wife lived, the court should have instructed the jury that defendant had a right to use whatever force was necessary to enter his own home; and whether he rented it or owned it was immaterial.

### 15.—Same—Threats of Deceased.

Where upon trial for murder the defendant's testimony raised the issue of threats by the deceased against the defendant, the court should have submitted article 713 of the Penal Code.

Appeal from the District Court of Tarrant. Tried below before the Hon. Irby Dunklin.

Appeal from a conviction of murder in the first degree; penalty, death.

The opinion states the case.

*Buck, Cummings, Doyle & Bouldin,* for appellant.—On question of change of venue: Randle v. State, 34 Texas Crim. Rep., 43; Meyers v. State, 39 Texas Crim. Rep., 500; Gallaher v. State, 40 Texas Crim. Rep., 296; Barnes v. State, 42 Texas Crim. Rep., 297; Cravens v. State, 103 S. W. Rep., 921. On question of admitting testimony of extraneous crime: 12 Cyc., p. 405; Ware v. State, 36 Texas Crim. Rep., 597; Kessinger v. State, 71 S. W. Rep., 597; Dyerle v. State, 68 S. W. Rep., 174; Johnson v. State, 42 Texas Crim. Rep., 440, 60 S. W. Rep., 667; Spriggins v. State, 60 S. W. Rep., 54; McIver v. State, 60 S. W. Rep., 50; Walton v. State, 41 Texas Crim. Rep., 454, 55 S. W. Rep., 566; Buck v. State, 38 S. W. Rep., 772; Kelly v. State, 18 Texas Crim. App., 262. On question of limiting testimony of extraneous crime: Tidwell v. State, 48 S. W. Rep., 184; Camarillo v. State, 68 S. W. Rep., 795; Bruno v. State, 58 S. W. Rep., 85; Gatlin v. State, 40 Texas Crim. Rep., 116. On question of defendant's credibility as a witness as defined in court's charge: Burnett v. Burnett, 83 S. W. Rep., 238; Simon v. State, 31 Texas Crim. Rep., 186. On question of confessions: 12 Cyc., p. 471; Searcy v. State, 28 Texas Crim. App., 513, 13 S. W. Rep., 782; Sparks v. State, 34 Texas Crim. Rep., 86; Paris v. State, 35 Texas Crim. Rep., 82; Nichols v. State, 32 Texas Crim. Rep., 391; Carsile v. State, 37 Texas Crim. Rep., 108; Cortez v. State, 83 S. W. Rep., 813; Sanchez v. State, 78 S. W. Rep., 504. On question of common law marriage: Burnett v. Burnett, 83 S. W. Rep., 238; Simmons v. Simmons, 39 S. W. Rep., 639; Cuneo v. Cuneo, 59 S. W. Rep., 284; Simon v. State, 31 Texas Crim. Rep., 186; 26 Cyc., p. 832; 19 Am. Eng. Enc. of Law, p. 1204.

*F. J. McCord,* Assistant Attorney-General, for the State.

BROOKS, JUDGE.—Appellant was convicted of murder in the first degree and his punishment assessed at death. Appellant, a man some-

thing over forty years of age, lived in the city of North Fort Worth, Texas. In 1891 he agreed to live with Flo B. Knight as man and wife. There was never any marriage license procured, or ceremony performed, but according to the facts before us they continued to live professedly in the relation of man and wife up to the time of the homicide. About six years before the homicide they moved to the city of Fort Worth alone. Subsequently, Mrs. Knight's daughter came to live with them. A short while before the homicide the daughter married the deceased, Ed Larmon. Appellant and his wife, as suggested above, were keeping house in the city of Fort Worth, the daughter living with them at the time of her marriage. On the day of the homicide, appellant, while at his work, received a note from his wife, saying in substance that appellant need not return home; that she had sold all the furniture and household effects, except his individual effects, and that it would do him no good to return home, since it would simply cause him trouble. Appellant went to the home, however, upon receipt of the note and being there informed by the daughter that she and her husband had bought the household effects, and she demanding that appellant leave the premises, taking along his individual furniture and clothing, he proceeded to call up the city marshal of North Fort Worth, O. R. Montgomery, and demanded of him that he (Montgomery) should place him (appellant) in peaceable possession of his property, which the city marshal refused to do on the ground that he could not take any such steps without a proper writ. Appellant then left the house and went to a pawn shop, paid the dues on a shotgun that he had previously pawned, and armed with the shotgun, he started to return to his home. On the way home he threw away the scabbard in which the shotgun was encased, and loaded the shotgun with buckshot, and put several additional loads in his pocket. When he got to the house he found that the deceased and his wife, or one of them, had fastened the doors of his home so he could not enter. He took his knife, cut the screen sufficiently to enable him to unlatch the screen door and entered the first door. Deceased and his wife slammed and locked the next door in his face; he kicked it down; they retreated and locked another door in his face; he kicked that down, and after deceased's wife had passed through the third door, the deceased turned facing appellant, whereupon appellant proceeded to shoot deceased, inflicting upon him three wounds with the shotgun. After shooting deceased twice he reloaded his gun and shot again. Immediately upon this taking place, he went out of the house and a general hue and cry was raised by various parties in pursuit of appellant, some of them halloing: "Shoot him! Shoot him! Kill him! Kill him." And finally as appellant proceeded down the street some of the party began to shoot at him and appellant fired back two or more times, wounding the city marshal, Montgomery, and a policeman named Howell. Appellant then proceeded to the creamery where he subsequently surrendered to the officers and after-

wards was brought to Dallas for safekeeping. The evidence is undisputed that appellant and his wife had been living together as man and wife in Fort Worth for six years. This we take it would constitute a common law marriage, however much it might conflict with questions of ethics or propriety, since the law of this State does not make it a prerequisite to have a license to constitute a valid marriage.

Bill of exceptions No. 1 complains of the failure of the court to change the venue. A half dozen or more witnesses swear, as is shown by the bill of exceptions that defendant could not get a fair and impartial trial in Tarrant County. However, we find from an examination of the bill that more witnesses swear that he could than swear that he could not. In fact, about twice as many swear that he could, as swear that he could not. The court heard the evidence in the matter, and in the shape of this bill we can not say there was any error in the ruling of the court. We have repeatedly held, however, that if there is so great a prejudice in a county as to preclude the idea that defendant can get a fair trial, the court should grant the motion to change the venue, but the bill before us does not present such a case.

Bill No. 5 shows the following: "While the witness, O. R. Montgomery, was upon the witness stand he was asked the following question: 'Now, I will get you to state to the jury what was said by you to Knight and what was said by Knight to you, if anything, and what was done to Knight and what was done by Knight to you, if anything, from the time you got up to that house until you arrested him, if you did arrest him?'" Appellant objected to this testimony on the ground that the State was seeking to go into a separate and distinct transaction occurring after the killing, that the same was prejudicial, res inter alios acta, all of which was overruled by the court, and witness testified as follows: "Well, I went up to the house after Mr. Knight, of course; that was my business up there. Well, I asked him to give me his gun and give up to me, and he told me that I had refused to do what he asked me to do that evening and he did not need me, and ordered me away from the house, and told me he would kill me if I come in. He told me that two or three times and I walked away from the house. I walked up to the house next door and telephoned the sheriff's office, and then I came out of the house as Mr. Knight came out of his house. After I came away I walked south on Central Avenue and down Lake Street south, and I followed him on down until he crossed 12th Street and I hadn't gone quite to 12th, and there is where he turned around and shot me.' Defendant testified that he knew at said time, O. R. Montgomery was city marshal of North Fort Worth." This bill of exception does not show how long after the killing of the deceased these matters occurred. Were we warranted in looking at the statement of facts to make out a bill this testimony would have been rendered admissible. In other words, the facts in this case show that after appellant shot the deceased

he immediately proceeded down the street and shot Montgomery as stated above. The whole matter was one continued transaction, and upon another trial the facts should be sufficiently connected to show this fact. They are part of the res gestae of the transaction and serve to throw light upon the animus, purpose and intent of the defendant, and therefore constitute part of the transaction, but in the shape this bill is in, this fact does not appear.

Bill No. 6 complains that the court permitted the State to prove by John Highsmith that he found a gun case after the killing. The bill of exception shows that the witness testified that he found a gun case and the pawnbroker testified that he turned a gun over to the defendant, owned by the defendant a short while before the homicide, the same day and only an hour or so before, and it is shown substantially to have been the same gun case owned by appellant. We hold this testimony was admissible. The gun case was found in the street somewhere near the place of the homicide. The fact that it was not thoroughly identified as the identical gun case in which appellant's gun had been inclosed at the time he got it from the pawn shop would not render it inadmissible but would merely go to its weight.

Bill No. 8 complains of the following: While the defendant's witness, Harry Morris, was upon the stand, defendant asked him the following question: "Did Mrs. Flo B. Knight ever come to your house and hold any conversation in your presence about what she was going to do to the defendant? A. Yes, sir. Q. I will ask you to state what was said in that conversation?" To which the State's counsel objected as immaterial because anything she might have said would be no justification for the offense in this case, if one has been committed. "We are in the attitude that we can not use Mrs. Knight and so we would practically be bound by anything he said, and I don't see what bearing it would have on this case. Mrs. Knight was not present at the time of the killing." The court, addressing counsel for appellant: "Do you propose to show by anything you may prove that it was communicated to the defendant? A. We propose to show a conspiracy between Mrs. Knight and Mrs. Larmon to get rid of the defendant for the purpose of getting this property."

The Court: "Do you propose to prove that it was brought to the knowledge of the defendant?" "A. No, we can not show that it was communicated to him, but it is offered to show and explain the actions of the deceased in connection with Mrs. Knight and Mrs. Larmon about this property on the day of the killing. We propose to prove also that the money of the defendant went into the property, and that the property taken in the name of Mrs. Larmon was paid for by defendant's money and that there was a conspiracy on the part of Mrs. Knight and Mrs. Larmon and the deceased."

The Court: "Do you propose to show that Mr. Larmon ever had

any knowledge of what was said?" Appellant's counsel: "I expect to prove that Mr. Larmon joined in the matter."

The Court: "What I am getting at—do you expect to show that there was a conspiracy between Mr. Larmon and Mrs. Knight at the time this conversation occurred?" Appellant's counsel: "No, sir, not at that time."

The Court: "I do not think the evidence is sufficient even as a circumstance tending to prove a conspiracy on the part of Mr. Larmon towards defendant." Appellant's counsel: "Well, anyway it would be admissible to show the bias of this witness that has come here and poured out her venom against the defendant."

The Court: "I don't think you can attack the credibility of a witness that way when she admitted that she did have ill-feeling towards the defendant." Appellant's counsel: "She never did admit it. She always evaded my question. She said in answer to my question that she had no love for him." The Court: "Think that is equivalent to that—I will sustain the objection.

The bill is approved with the statement that all of the above testimony was introduced in the absence of the jury. Furthermore, the bill is defective in not stating what the witness would have sworn. In addition to this objection to the testimony it occurs to us that, in view of the fact that Mrs. Knight was not upon the premises and in view of the fact that the motive of appellant was clear and undisputed, it becomes utterly immaterial what was their ulterior purpose in an effort to get charge of the property of appellant, since the uncontradicted record shows that appellant's wife had sold his property, or at least, household effects, in which he was equally interested with her, to the wife of the deceased, and had refused admission to appellant to his own home. We furthermore hold that it is utterly immaterial as to who paid for the house or whose money went to pay for the house, since the uncontradicted testimony shows that the appellant and his wife were keeping house at the place, and that the furniture and fixtures therein belonged to appellant and his wife. She had no right to sell it without his consent, nor did deceased and his wife have a legal right to refuse him admittance to his home. So we suggest that upon another trial all effort to prove the question as to who paid for the property, who it belonged to or how it was paid for, becomes utterly immaterial under the facts of this case, except to the extent of showing that appellant and his wife had owned the property in the house and were using it as a domicile at the time of the homicide.

Bill of exception No. 9 shows that while defendant was on the stand he was asked the following question: "Now, after you were arrested and after you were placed in jail and brought out, you made a statement which was taken down in writing and read over to you and you signed it in the presence of witnesses, did you not? When was that? Q. Well, probably the next morning. Do you remember, Mr. Roy, the county attorney, and Mr. Rea, the chief deputy sheriff of this

county—Mr. Bill Rea?ˇ A. I know Mr. Roy.  Mr. Roy came over to the jail to see me.  And the next morning after Mr. Roy was over there that night, I was brought out, down stairs in the jail and I then made a statement, and it was read over to me.  I did not read all of it myself, because part of that statement was held from me. There ̇was a sheet that was held back.  I read a part of the statement. Nobody purported to read that statement to me.  No, sir, nobody.  If you want to know what sheet it was that was held back I would certainly love to have that sheet called for.  I would like to see it myself.  Mr. Parker was present when I signed it, and Roy and Mr. Claypool and Mr. Burroughs.  I took part of the statement then and read it over, and as I say, there was one sheet held back that they did not allow me to get hold of.ˇ I do not know what sheet was held back.  Mr. Parker simply folded it up and put it in his pocket and walked away.  Mr. Roy was not there at that time.  One piece of the statement I did not see."

Cross-examination: "Q. What did Mr. Roy tell you when he came over there?  A. He said it will be all the better for you if you make me a statement just how this occurred."

V. R. Parker, assistant county attorney, being duly sworn, testified: "I am assistant county attorney, and have been since April 6, this year."  "I will get you to state if you was present when that statement was signed." (Here witness was ̇handed written confession of defendant, hereto annexed and marked Exhibit A, and made a part hereof.)

Defendant's counsel: "If this evidence is offered for the purpose of laying a predicate for the introduction of this instrument, I object to parol evidence, because the law prescribes that the predicate for the introduction of the instrument must be in the instrument."

The Court: "I will overrule that objection at present."

The witness continues: "I was present when this instrument was signed.  Ike Knight, the defendant, signed it.  Each of these pages were read over to the defendant.  I warned him.  At that time defendant was in the custody of Mr. Burroughs, the jailor of Tarrant County, Texas.  This statement was written in the office of the jail of Tarrant County.  I do not know whether he was confined or not; he was in the office and custody of the jailor.  The door was not open so he could walk out.  He could not have gotten out if he wanted to."

State's counsel: "We offer this statement in evidence, your Honor." Defendant's counsel: "We object to it, because the proper predicate as required by law has not been laid for its introduction in evidence. Because the statement itself does not contain the statement that he was warned by the person to whom the same ̇was made.  Second: Because the testimony in the case shows the defendant was told by the county attorney that it would be. better for him to make a statement.  Therefore, it was not freely and voluntarily made, that the statement itself does not show before whom the same was made.  And, further, upon the ground that the decisions in construing a former

statute, which used the same language, have all held, as I remember, that the statement must notify the defendant—the warning must notify the defendant that it will be used as evidence against him, and that is not done in this case." The assistant county attorney then stated, that he properly warned the defendant that it could be used as evidence in the trial for the killing of deceased, Ed Larmon, as well as shooting officers Montgomery and Howell. The statement is quite long and voluminous and concludes as follows: "The above and foregoing statement is made by me, after having been warned by Virgil R. Parker, assistant county attorney of Tarrant County, that I did not have to make any statement at all; that any statement made by me would be used against me in the trial of my cases wherein I am charged with the murder of Ed Larmon in North Fort Worth, Texas, on the 11th day of April, 1908, and also in cases wherein I am charged with having committed the offense of assault on the persons of O. R. Montgomery and R. D. Howell and Azalle Krause, in North Fort Worth, Texas, on the same date. This statement is freely and voluntarily made by me without any inducement or hope of reward." Signed by appellant, and by H. C. Cantrell and F. B. Claypool as witnesses. We see no objection to the statement. It comports in all respects with the statute prescribed with reference to written confessions of defendants in jail. However, in view of the fact that appellant swears that a warning was not given and a hope of reward was offered, the court, in charging the jury, should have told them not to consider said statement if they believed any inducement was held out or hope of reward offered at the time the statement was made.

Bill of exceptions No. 11 complains that the State was permitted to ask the witness J. W. Caruthers on cross-examination if he was in Tennessee when defendant left there, and said witness to answer as follows: "A. Yes, sir. Q. Do you know what he left Tennessee for? A. No, sir." Defendant's counsel then asked said witness the following question: "Q. If he had left Tennessee for any crime would not you know that?" The court sustained objection to this question. The bill shows if said witness had been permitted to answer said question he would have testified that if he (defendant) had had to leave Tennessee for cutting a man back there, witness, knowing defendant as a peaceable, law abiding citizen, would have known of it and heard of it. The court approved the bill with the statement that defendant himself testified on the trial on cross-examination by the State that he did cut a man, about sixty miles from the Tennessee line. We do not think this testimony should have been admitted. If the defendant was indicted in Tennessee for a felony or any crime involving moral turpitude within the last few years prior to this homicide, said fact could be proved, but the mere fact that he cut a man does not necessarily involve moral turpitude and therefore was inadmissible.

Bill No. 12 complains that the State attempted to prove the

opinion of Mrs. J. M. Jordan as to why it was that when defendant was being shot at, he turned and shot two officers. This testimony seems to have been excluded and ought to have been excluded by the court.

Bill of exception No. 13 complains of the argument of counsel. In view of the reversal of this case upon other matters we do not see fit to discuss these matters, but we again and again insist that counsel should stay within the record and recollect the fact that abuse is not argument; that there is neither logic, law nor reason in it; that defendant is entitled to a fair trial and counsel should be careful to observe all the amenities of our profession and stay within the letter of the law and the evidence in discussing cases before the jury.

Bill No. 23 complains of the court's action in not excluding, as we understand from the record, the facts immediately following the homicide in this case. Upon another trial if these facts appear to have happened within a few minutes following the homicide so as to throw them as part of one transaction, the testimony would be admissible. As stated above, the facts in the record show them to be such, but the bill does not show whether they were or not.

The 30th ground of the motion for new trial complains of the court failing to give the following special charge, to wit: "And you are instructed under the evidence in this case, that defendant and Flo B. Knight were legally husband and wife and their cohabitation would not be illicit and adulterous and that all property acquired by either Ike S. Knight or Flo B. Knight, during the existence of their marriage relation through their joint community or individual efforts is community property, and under the law the husband has the legal right to manage and control the same. And you are further instructed in this connection that the husband has the exclusive management and control of the separate estate of the wife, and by the term, 'separate estate,' is meant any property acquired before marriage or any property which may be acquired by the spouse by gift, devise or descent after marriage. And in this connection you are further instructed that the wife can not without the consent of her husband sell, convey or otherwise dispose of even her separate property." This charge is the law of this case and should have been given to the jury.

Appellant asked the court to give the following special charge: "That defendant was lawfully entitled to occupy the place on Lake Avenue, where he and his wife, Flo B. Knight, resided and that the said Flo B. Knight, or Nellie Larmon or Ed Larmon, neither, had the right to forcibly eject or attempt to eject him therefrom, and that if the jury believed from the evidence that on the 11th day of April, A. D. 1908, the said Flo B. Knight, Nellie Larmon or Ed Larmon were attempting forcibly to eject the defendant, Ike S. Knight, from the premises where he resided, then they were in-

structed that defendant, Ike S. Knight had the authority to resist any force of whatever kind or character so used by them with like force, even to the point of taking the life of the person so using such force if necessary to prevent such forcible ejection therefrom." There is no evidence in this record to authorize this charge. It is true that deceased and his wife had taken possession, under a bill of sale from appellant's wife, of his household effects, but there is no evidence that they, either of them, tried to take them away from him at the time of the homicide.

Appellant complains of the following portion of the court's charge: "If you find from the evidence that defendant and Flo B. Knight in good faith, agreed each with the other, to live together as husband and wife, and thereafter, and in pursuance of said agreement, they in good faith did live together as husband and wife, then you will find they were lawfully married, even though you should find that no marriage license was procured by them. But if you do not so find from the evidence then you can not consider their living together as husband and wife, if they did so live together, for any purpose except as tending to affect, if you believe it does affect, the credibility of the defendant as a witness on the trial of this case." Appellant objects to this charge, because the fact that they lived together as husband and wife certainly would not affect defendant's credibility, and the court should have given special charges Nos. 1 and 2 as requested. Second, because the evidence is undisputed that they did so agree and did so live together, and this fact that they had so lived, if the evidence had shown that they were living together as husband and wife or otherwise, would not be admissible for the purpose of affecting defendant's credibility as a witness as you can not affect a witness' credibility by specific acts of immorality, much less a defendant as a witness in his own behalf; that the court should have charged the jury that their living together as husband and wife was lawful, and the fact that a marriage license was not procured and no ceremony performed, would not be considered by them for any purpose. As appellant above insists in his objection, this charge is erroneous. There was no evidence that they did not live as husband and wife, together; hence, it was reversible error to tell the jury that if they believed that they did not so live together, that they could use that fact to affect appellant's credibility as a witness. The court should have told the jury that appellant and Flo B. Knight were man and wife; that appellant had a right to take the gun home on the day of the homicide; that he had a right to use whatever force necessary to enter his own home; that he had a right to kick down any door that obstructed his passage from one portion of his house to the other. This was his house, whether rented or owned by a third party. As stated above, as to who owned the house, was utterly

immaterial and no evidence should have been offered on this question.

The appellant complains that the court erred in failing and refusing to submit to the jury the law as laid down in article 713 of the Penal Code, with reference to threats of deceased defendant's own testimony raising said issue. This position is correct.

We have carefully reviewed all of appellant's assignments of error, many of which can not occur upon another trial of this case, and for the errors pointed out the judgment is reversed and the cause remanded.

*Reversed and remanded.*